JUSTICE WHEAT
delivered the Opinion of the Court.
¶1 Dean O. Crider (Crider) appeals from the judgment of the Montana First Judicial District Court, Lewis and Clark County, following his jury conviction for felony Sexual Intercourse Without Consent in violation of § 45-5-503(1), MCA; misdemeanor Partner or Family Member Assault (PFMA) (second offense) in violation of § 45-5-206( l)(a), MCA; and felony Tampering With Witnesses and Informants in violation of § 45-7-206(l)(a), MCA. We affirm.
ISSUES
¶2 We review the following issues:
1. Did the District Court abuse its discretion when it admitted evidence that Crider had previously assaulted and harassed the victim?

2. Should we exercise plain error review to review the District Court’s instruction to the jury regarding the evidence of the previous bad acts?

3. Did Crider receive ineffective assistance of counsel when his counsel failed to object to the State’s use of the previous bad acts ?
FACTUAL AND PROCEDURAL BACKGROUND
¶3 Crider was M.W.’s high school crush. The two had been good friends for fifteen years when they started dating, in 2009. On July 8, 2011, Crider and M.W. took M.W.’s two young children to play at a park. While they were at the park, M.W. received a text message from an ex-boyfriend of hers that read “Where’s my Friday night blow job J LOL.” Crider saw the message. M.W. testified that the message was supposed to be a joke and would not have meant anything if Crider had not seen the message. “[B]ut because he was sitting there, it — it meant that there was going to be some not-so-fun stuff happening.” M.W. routinely allowed Crider to look through her phone because he always wanted to know who was calling her and texting her. After seeing the *189 message, Crider became very angry.
¶4 Crider and M.W. drove to M.W.’s mother’s house and dropped the children off. Then they went to Crider’s house, where they argued for a little while and began drinking shots of Black Velvet whiskey. When they finished the Black Velvet they went to the Libation Station, two blocks from Crider’s house, where they ran into friends he knew. M. W. testified that “while we were there, it was like everything was fine and nothing had happened.” Crider wanted to go to East Helena to continue socializing with the friends they met at the bar. The two bought a liter of Black Velvet to go and began driving to East Helena. They began arguing en route. While M.W. was driving, Crider began burning her with a cigarette and poured three-quarters of the bottle of Black Velvet over her head. At that point, M.W. testified, Crider had reached a point of anger where “he’s just a completely different person... . It’s like something clicks in his head, and it’s just done. There’s no changing his mind or calming him down.” She explained that she had not recognized his propensity for this kind of anger until about four months into the relationship. M.W. stopped the car and said she would try to fix things, because she loved him. The two returned to Crider’s house to try to “work through it.”
¶5 At Crider’s house, M.W. and Crider drank more Black Velvet. At some point M.W. may have told Crider he could “do whatever he wanted” to her. Crider told her that if she was going to act like a whore he was going to treat her like a whore. He made her take offher clothes and give him oral sex. Because Crider was holding M.W.’s hair and controlling the oral sex, she vomited four or five times. M.W. told Crider to stop. He did not stop. After at least half an hour of this, Crider dragged M. W. into the bathroom by her hair and began having anal sex with her. That did not last very long because “it hurt really bad.” M.W. told Crider to stop and he stopped almost immediately. He threw her on the bed and penetrated her vagina with his fist. This, M.W. testified felt “comparable to having a baby.” M.W. told Crider to stop and kicked him offher. He grabbed her by her hair and her arms and threw her, naked, out of the house. M.W.’s clothes and car keys were inside the house. She pounded on the door and begged Crider to let her back in, because she loved him and wanted to make it better. After five minutes, Crider let her back in. He pulled her around by the hair, threw her into walls and made her give him more oral sex. Then he threw her out again. This time she went to his mother’s house, next door, and hid in the porch. His mother drove her home at 5:30 a.m.
¶6 The next morning, M.W. called the police to ask for help *190 recovering her car and her keys. The police explained they could not do that unless a domestic report was filed. She declined to file a report because she did not want Crider to get in trouble. M.W. and Crider texted back and forth for awhile, then talked to one another. Crider was “apologetic and sorry and said he didn’t really remember what happened.” They arranged a time when M.W. could get her possessions, but did not see each other again. M.W. did not tell anyone what had happened until she spoke to a friend a few days later. Her friend reported the incident. M.W. made verbal and written statements about the incident to the domestic violence officer with the sheriffs department.
¶7 Eight days after the incident occurred, and at the domestic violence officer’s recommendation, M.W. went to the emergency room for an examination. The examination revealed bald spots on M.W.’s head where Crider had pulled out her hair. It also revealed cigarette bums, and bruising around both eyes. M.W. had mg burns and bruises on her knees. She had a bruise and a cut on her side that she believed she got when Crider threw her into a heater. She had abrasions around her anus and inside of her rectum.
¶8 Over Crider’s motion in limine, the District Court admitted evidence of previous incidents of violence between M.W. and Crider, narrowly finding it probative of “motive” or “absence of mistake or accident.” The court declined to admit several incidents involving Crider with a previous partner. In July 2010, Crider had been convicted of PFMA to an incident with M.W. In January 2011, M.W. reported to law enforcement that Crider had broken down her door. In May 2011 M.W. called law enforcement to report that Crider was continually calling her and was parked in the area in which she lived. And in June 2011, M.W.’s mother called law enforcement to report that Crider was continually calling her phone. The District Court specifically cautioned in its Order ruling on the motion in limine: “If an issue arises about whether offered evidence falls within the parameters of that allowed by this Order, the parties shall bring the matter to the attention of the Court out of the hearing of the jury.”
¶9 Between the time when charges were pressed against Crider for his conduct in the July 2011 incident and the trial date, M. W. recanted her allegations against Crider. The defense entered into evidence several text messages M.W. sent to Crider saying that she still loved him and asking to see him before she pressed charges. There were also several photographic text messages of a tattoo of Crider’s initials that M.W. got on her chest, after the incident occurred, inside a heart tattoo *191 she had. Because the two were attempting to reconcile and Crider was influencing her, M.W. said, M.W. made a statement to the domestic violence officer with the sheriffs department that the sex had been consensual, but had been overly rough and aggressive. As part of this effort, and at Crider’s urging, M.W. also left several voicemails on Crider’s phone to make it seem as though she was at fault for the incident. She said that she had lied about the rape, that she had had an abortion without telling him, and that she was using methamphetamine. She also met with his lawyers to submit a tape recorded statement that she had lied about the rape.
¶10 Both the State and the defense hired experts to testify at trial regarding the psychology of abuse. The State’s expert testified that domestic violence is a pattern of controlling behaviors that also includes violence at times to reinforce the control over the other person. The expert testified that often violence between partners will escalate over time — that a person who is not violent at the beginning of the relationship will become violent. Often after parties separate following an incident of domestic violence, the victim, believing the abuser is really sorry, will begin to question whether he or she correctly perceived events and whether his or her actions caused the violence. The expert testified that sometimes victims will recant allegations or minimize the abuse that occurred.
¶11 The defense expert testified that behaviors among abuse victims varied too widely to reliably characterize that behavior. The defense expert further testified that recanting or minimizing allegations of domestic violence does not necessarily mean someone is a victim. On cross examination, however, the defense expert conceded that it is not uncommon for victims of abuse to recant allegations, return to their abusers, or he to get abusers out of trouble.
¶12 During its opening statement, the State explained: “And I can tell you that during this trial you’re going to hear from [M.W.], but I’m not 100 percent sure whether what you’re going to hear from her about that night when she sits in that chair — what version of it you’re going to hear.” When M.W. testified, she stated that the July 2011 incident was nonconsensual, giving the original version of events set forth above. She testified that she had recanted her allegations of rape because she still loved Crider and was attempting to reconcile with him. She also testified about the July 2010 PFMA. In that case, Crider had thrown her up against a wall, slammed her head against the hood of his vehicle and thrown her on her face on a gravel road. This occurred because M.W. asked him to leave her house related to his *192 behaviors involving other women, and threatened to call the police when he became physically aggressive. M.W. disobeyed a court order to attend the trial and testify against Crider in that case because she did not want him to go to jail.
¶13 After M.W. testified at trial, the State requested that the District Court instruct the jury as to the other “bad acts.” The court read the following instruction to the jury:
The state has offered evidence that the defendant, at another time, engaged in other crimes, wrongs, or acts. That evidence was not admitted to prove the character of the defendant or show that he acted in conformity therewith. The only purpose of admitting that evidence was to show proof of motive, opportunity, plan, knowledge, identity, or absence of mistake or accident. You may not use that evidence for any other purpose.
The defendant is not being tried for those other crimes, wrongs, or acts. He may not be convicted for any other offense than that charged in this case.
For the jury to convict the defendant of any other offense than that charged in this case may result in unjust double punishment of the defendant.
When the District Court settled jury instructions, the defense confirmed it had no objection to the prior bad acts instruction “as requested by the parties.” When the final instructions were read, the court said it would not read the other prehminary instructions that had already been read, but re-read the one on prior bad acts for emphasis. The State, in its closing statement, used the prior bad acts evidence to imply that M.W. was a victim of domestic violence.
STANDARDS OF REVIEW
¶14 This Court reviews a district court’s ruling regarding the admission of other crimes, wrongs, or acts for an abuse of discretion. State v. Green, 2009 MT 114, ¶ 14, 350 Mont. 141, 205 P.3d 798. To the extent the court’s ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo. Puccinelli v. Puccinelli, 2012 MT 46, ¶ 12, 364 Mont. 235, 272 P.3d 117.
¶15 We reviewjury instructions to determine whether the instructions as a whole fully and fairly instruct the jury on the applicable law. State v. Ring, 2014 MT 49, ¶ 13, 374 Mont. 109, 321 P.3d 800. District courts are given broad discretion when instructing a jury and reversible error occurs only if the jury instructions prejudicially affect the defendant’s substantial rights. Ring, ¶ 13.
*193 ¶16 Claims of ineffective assistance of counsel (IAC) present mixed questions of law and fact that we review de novo. Green, ¶ 14.
DISCUSSION
¶17 2. Did the District Court abuse its discretion when it admitted evidence that Crider had previously assaulted and harassed the victim ?
¶18 Crider argues that the District Court abused its discretion in admitting the evidence of his prior bad acts to prove motive and absence of mistake or accident. The State counters that Crider did not properly preserve this issue for appeal because he never objected to the prior bad acts evidence on the basis that the District Court improperly admitted it to show motive or absence of mistake.
¶19 A motion in limine has “special advantages” and serves an important strategic purpose. State v. Ingraham, 1998 MT 156, ¶ 36, 290 Mont. 18, 966 P.2d 103. We have encouraged the use of motions in limine to preserve objections in cases where “[a] party may not wish to register an objection in the presence of the jury for tactical reasons, yet may wish to preserve the objection on appeal.” Ingraham, ¶ 36. A party raising an objection through a motion in limine “need not continually renew the objection to preserve alleged errors for appeal.” Hulse v. Dept. of Justice, 1998 MT 108, ¶ 46, 289 Mont. 1, 961 P.2d 75.
¶20 To preserve an objection for appeal through use of a motion in limine, the objecting party must make the basis for his objection clear to the district court. Ingraham, ¶ 36. A district court will not be put in error where it was not given an opportunity to correct itself. State v. Weeks, 270 Mont. 63, 85, 891 P.2d 477, 490 (1995). “To preserve a pretrial objection for appeal through a motion in limine, the motion must be ‘sufficiently specific as to the basis for the objection.’ ” State v. Stock, 2011 MT 131, ¶ 45, 361 Mont. 1, 256 P.3d 899 (quoting State v. Vukasin, 2003 MT 230, ¶ 29, 317 Mont. 204, 75 P.3d 1284). The motion in limine must specify the evidence to which the defendant is objecting. See Vukasin, ¶¶ 35-37 (motion in limine was not sufficient to preserve an issue for appeal where it only sought to exclude any “reference, comment, allusion or statement made to any crime, wrong or act pursuant to M.R. Evid. Rule 404(b)” and did not specify the basis for the objection) (quotation omitted).
¶21 In State v. Dist. Court of the Eighteenth Judicial Dist., 2010 MT 263, ¶ 49, 358 Mont. 325, 246 P.3d 415, we set forth the process governing admission of Rule 404(b) evidence. First, the prosecution discloses to the defendant the evidence it plans to introduce. Eighteenth Judicial Dist., ¶ 49. This is only a disclosure requirement; *194 the prosecution is not required to explain why the evidence is admissible. Eighteenth Judicial Dist., ¶ 49. After disclosure has occurred, the defendant may, via motion in limine, explain why the evidence should be excluded as irrelevant, unfairly prejudicial, relevant only for an improper propensity inference or otherwise inadmissible. Eighteenth Judicial Dist., ¶ 49. Then, the prosecutor must respond to the defendant’s objections and demonstrate the evidence’s admissibility. Eighteenth Judicial Dist., ¶ 49. The court should conduct a hearing and issue a written decision with appropriate findings of fact and conclusions of law. Eighteenth Judicial Dist., ¶ 49.
¶22 In this case, in the first step, Crider was placed on notice of the evidence the prosecution intended to introduce during the normal course of discovery, when the State turned over a number of police reports against him. Those reports dated back to 2004 and involved Crider and a former girlfriend as well as Crider and M. W. Crider knew the State intended to introduce this “evidence of crimes, wrongs, or acts pursuant to M.R.Evid. 404” when, in the second step under the foregoing process, he filed the brief supporting his motion in hmine. His brief specified that its purpose was to raise “objection to any such effort.” Specifically, Crider’s brief referenced the reports dating back to 2004 and highlighted the danger of bad acts evidence: That it could lead a jury to conclude that, because the defendant had engaged in past bad conduct, his character showed he had committed the crimes at issue. Because he did not know the precise Rule 404(b) exceptions on which the State intended to rely to introduce the evidence, the motion set forth general grounds for excluding Rule 404(b) evidence and opposed the evidence pursuant to Rule 403, on the grounds that it was more prejudicial than probative. Taking the third step noted above, the State responded, setting forth the specific evidence it sought to introduce and the argument that the evidence was admissible to show motive and absence of mistake or accident. Crider did not file a reply brief and neither party requested a hearing. Less than two weeks before trial, the District Court ruled on the motion, concluding that only the proposed evidence of prior acts involving M.W. was admissible, to show motive or absence of mistake or accident. The District Court excluded Crider’s bad acts with partners other than M.W.
¶23 We conclude that Crider’s motion in hmine was sufficiently specific to preserve his objection to the bad acts evidence for appeal. Crider’s brief made clear that he was objecting to the prior bad acts evidence because it could lead the jury to make an impermissible *195 character inference, which is the essence of his argument on appeal. It also specifically referred to evidence of acts from between 2004-2007 — evidence the District Court excluded. These arguments made the substance of, and basis for, Crider’s objection to the prior bad acts evidence sufficiently clear that the District Court was able to address them. Further, it is evident from the court’s order in limine that it was able to grasp the theory and basis for Crider’s motion, as the court granted his motion in part by excluding all bad acts evidence involving victims other than M.W., but denied the motion as to acts involving M.W. This case is thus different from others like Vukasin, where the District Court was not directed to the issue the defendant sought to raise on appeal. Because the facts and chronology before us establish that the parties followed the steps outlined in Eighteenth Judicial Dist., and the District Court was able to make an informed ruling on Crider’s motion in limine, we address Crider’s contention that the evidence was improperly admitted on its merits.
¶24 Evidence of prior bad acts by a defendant is admissible as long as it is not offered or used for an improper purpose. To this end, Rule 404(b), provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
In State v. Stewart, 2012 MT 317, ¶ 65, 367 Mont. 503, 291 P.3d 1187, we explained that the use of prior bad acts evidence to prove the commission of the crime at issue (or “actus reus”) does not necessarily run afoul of Rule 404(b). Rather, the rule prohibits a theory of admissibility: Using propensity evidence to draw “the inference from bad act to bad person to guilty person.” Stewart, ¶ 61. Rule 404(b)’s prohibition “ ‘applies only when that ultimate inference [of conduct] is coupled with the intermediate inference of the defendant’s personal, subjective character. If the prosecutor can arrive at an ultimate inference of conduct through a different intermediate inference, the prohibition is inapplicable.’ ” Stewart, ¶ 65 (quoting Edward J. Imwinkelried, Uncharged Misconduct Evidence vol. 1, § 4:1,4-5 to 4-6 (rev. ed., Thomson Reuters/West 2009)).
¶25 Contrary to the premise underlying Crider’s motive argument, a prior bad act need not give rise to a motive or reason for the defendant to commit the crime charged. Eighteenth Judicial Dist., ¶ 59. In *196 Eighteenth Judicial Dist., ¶ 59, we explained that a prior bad act may evidence the existence of a motive without supplying the motive. In such cases, the motive is the cause and both the prior acts and the act at issue are effects. Eighteenth Judicial Dist., ¶ 59. The prosecutor uses the prior bad acts to show the existence of the motive and the motive strengthens the inference that the defendant committed the crime charged. Eighteenth Judicial Dist., ¶ 59.
¶26 Here, the State argues on appeal that the prior bad acts evidence showed “Crider’s motive to exert power and control over his victim, and to use force to do so[.]” The jury heard testimony from the State’s expert that domestic violence generally involves issues of power and control; and that “[sjexual violence is often included as a way to demean the partner and maintain that control.” The prior incident of physical violence occurred in Crider’s attempt to control M.W. by preventing her from leaving him and preventing her from calling the police. Breaking down M.W.’s door is an act that exerts control over M.W.’s physical space. Crider’s constant phone calls to M.W. and lurking outside her place of residence tend to show Crider’s desire to control M.W.’s movements by monitoring her location. His constant calls to her mother exert control over her by harassing her relatives. The motive of exerting power and control is common to the prior acts admitted and is probative of Crider’s motive as to the sexual acts at issue in this case.
¶27 For similar reasons, the incidents speak to absence of mistake or accident and are admissible because they refute an aspect of Crider’s affirmative defense. Part of Crider’s defense is that he and M.W. frequently engaged in rough sex and that the sex on the occasion at issue was consensual. In other words, Crider claims that if he exceeded her consent, he did so by accident. The evidence of prior incidents showing Crider’s motive to exert power and control over M.W. refutes that argument. In Eighteenth Judicial Dist., we permitted evidence that a mother accused of killing her child had mistreated the child in the past, when the mother suggested the child’s death was accidental. Eighteenth Judicial Dist., ¶ 61. Similarly, here, the State may present evidence that tends to refute Crider’s characterization of the brutalization he forced M.W. to endure as mistaken or accidental.
¶28 The Dissent relies on State v. Keys, 258 Mont. 311, 852 P.2d 621 (1993), to argue that “the defendant’s motive or intent is not relevant where the only issue is whether the victim consented to the sexual intercourse.” That argument falls flat because Keys, which predates Eighteenth Judicial Dist, is factually distinguishable, and the *197 question of whether M.W. consented is not the only issue here. Keys concerned whether an incident involving indecent exposure and assault by the defendant with another victim was admissible as evidence that he had committed the sexual intercourse without consent at issue in that case. Keys, 258 Mont. at 316, 852 P.2d at 624. We concluded that the evidence was not relevant where the only issue was whether the alleged rape victim consented. Keys, 258 Mont. at 316, 852 P.2d at 624. Here, however, the State sought to admit Crider’s prior incidents with M. W. as probative of Crider’s motive to control or harass M. W. Such a motive was relevant, not only to Crider’s motive as to the sex acts alleged, but also to his motive to commit the offenses of PFMA and witness tampering with which he was also charged related to this incident. Thus, unlike in Keys, where the only crime charged was sexual intercourse without consent, M.W.’s consent is not the only issue. M.W., unlike the victim in Keys, was also the victim of the prior bad acts the prosecution sought to admit. The District Court excluded the evidence we found improper in Keys — evidence of the defendant’s prior acts with someone other than the victim. The evidence of Crider’s prior acts with M.W., however, was relevant and probative as to his motive to harass and control her. Accordingly, we conclude that the District Court did not abuse its discretion in determining that Crider’s prior acts were admissible to show motive or absence of mistake or accident.
¶29 2. Should we exercise plain error review to review the District Court’s instruction to the jury regarding the evidence of the previous bad acts ?
¶30 Where a defendant has not preserved an issue for appeal, this Court may, at its discretion, exercise plain error review to review an alleged error. We invoke the plain error doctrine sparingly, on a case-by-case basis. State v. Daniels, 2011 MT 278, ¶ 32, 362 Mont. 426, 265 P.3d 623. “For plain error review of an unpreserved issue, the appealing party must (1) show that the claimed error implicates a fundamental right and (2) ‘firmly convince’ this Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the ftmdamental fairness of the trial or proceedings, or compromise the integrity of the judicial process.” Daniels, ¶ 32.
¶31 Crider argues that the District Court improperly instructed the jury that the evidence could be considered to prove motive, opportunity, plan, knowledge, identity, or absence of mistake or accident, when the court had previously ruled that the evidence could *198 be considered only to prove motive or absence of mistake or accident. Citing no authority, he argues that this alleged error violated his fundamental right to due process of law guaranteed by the United States and Montana Constitutions. This, in his view, leaves unsettled the fundamental fairness of his trial and warrants plain error review. ¶32 Not only did Crider twice fail to object to the jury instruction in question, he acquiesced to it both times it was read at trial. The record shows that the purpose for which the instruction was offered was not to expand the types of use the jury might make of the evidence, but rather to limit them. The instruction stressed: “The Defendant is not being tried for those other crimes, wrongs or acts. He may not be convicted for any other offense than that charged in this case.” The jury instruction specifically provided that the evidence “was not admitted to prove the character of the Defendant or to show he acted in conformity therewith.” It accurately restated the law’s provision that evidence of other crimes, wrongs or acts may be used to prove, for instance, motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. While the jury instruction could have been more specific about the purposes for which the evidence could be considered in this case, it adequately served the underlying Rule 404 purpose of barring the “inference from bad act to bad person to guilty person.” See Stewart, ¶ 61; Eighteenth Judicial Dist., ¶ 47. Crider has failed to convince this Court that the jury instruction leaves unsettled the fundamental fairness of the proceedings and we decline to exercise plain error review.
¶33 3. Did Crider receive ineffective assistance of counsel when his counsel failed to object to the State’s use of the previous bad acts?
¶34 This Court has adopted the two-pronged test of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), in judging IAC claims. State v. Kougl, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095. To show IAC, a defendant must prove both (1) that counsel’s performance was deficient, and (2) that counsel’s deficient performance prejudiced the defense. Whitlow v. State, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. A defendant must satisfy both prongs of this test in order to prevail on an IAC claim. Whitlow, ¶ 11. There is a strong presumption that an attorney’s conduct falls within the wide range of reasonable professional service, and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a sound trial strategy. Whitlow, ¶ 15. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the *199 circumstances of counsel’s challenged conduct and to evaluate the conduct from counsel’s perspective at the time. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. The question, however, is not merely whether counsel’s conduct flowed from strategic decisions and trial tactics but whether it was based on reasonable professional judgment. Whitlow, ¶ 19.
¶35 Generally, this Court will only consider IAC claims raised on direct appeal where the record reveals the reasoning underlying a counsel’s actions or omissions. State v. White, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340; see State v. Aker, 2013 MT 253, ¶ 22, 371 Mont. 491, 310 P.3d 506 (only record-based IAC claims are reviewable on direct appeal). This is because the question of whether counsel’s conduct was based on the exercise of reasonable professional judgment generally demands that we inquire why counsel acted as alleged. To determine whether an IAC claim can be considered on direct appeal, we seek to answer that question by reference to the record. Aker, ¶ 34. We have explained that “a non-record based act or omission by counsel may actually include a failure to object to the admission of evidence which is evidenced by the record.” White, ¶ 16.
¶36 We will also consider IAC claims on direct appeal where counsel is faced with an obligatory, non-tactical action, or there is no plausible justification for defense counsel’s actions. Kougl, ¶ 15. In those cases, the question is not “why,” but “whether” the counsel acted, and if so, if counsel acted adequately. Kougl, ¶ 15. “Whether the reasons for defense counsel’s actions are found in the record or not is irrelevant. What matters is that there could not be any legitimate reason for what counsel did” Kougl, ¶ 15. Such situations are “relatively rare.” Kougl, ¶ 15.
¶37 Crider argues that there was no plausible justification for his counsel’s failure to object to the State’s use of the bad acts evidence at trial. He argues that the District Court admitted the bad acts evidence narrowly, to show that Crider had a motive to harm, control and harass M.W. and to show that M.W.’s injuries did not stem from an accident or mistake. The State improperly used the evidence to establish M.W. as a victim of domestic violence and thereby cure her “credibility problems,” he alleges. This use, he claims, exceeded the purposes for which the court had authorized the evidence could be used under the Rule 404(b) exceptions. His counsel's failure to object to the State’s use of this evidence, he asserts, was inexcusable and prejudiced his defense.
¶38 We are not persuaded that Crider’s counsel’s failure to object to *200 the State’s use of the bad acts evidence at trial was unjustifiable. We have generally recognized that the timing and number of objections is a matter of counsel’s tactical discretion. Aker, ¶ 35. “An attorney is not required to make all possible objections during a trial, and may legitimately decide to forego certain objections as a matter of trial tactics.” State v. Morsette, 2013 MT 270, ¶ 19, 372 Mont. 38, 309 P.3d 978. To hold that Crider’s counsel was obligated to object to the State’s use of the evidence would gut this principle and we decline to do so.
¶39 This matter is suitable for consideration on direct appeal because the record is sufficient to evaluate Crider’s LAC claim related to his counsel’s alleged omission. Rule 404(b) only bars the use of prior acts evidence to show action in conformity with propensity. See Stewart, ¶ 61. Pursuant to Rule 402, all relevant evidence is admissible. M. R. Evid. 402. The Montana Rules of Evidence define relevant evidence as follows:
Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant.
M. R. Evid. 401 (emphasis added). The prior acts evidence was admissible to reflect on M.W.’s credibility, because the District Court had already concluded, pursuant to Rule 403, that its probative value outweighed the danger of prejudice. No grounds for an objection to the State’s use of the evidence existed and Crider’s counsel was not ineffective for failing to make one.
¶40 Even if this were not the case, however, the record reveals that Crider’s counsel’s actions, taken in context, were not ineffective. Crider made use of the motion in limine to attempt to exclude evidence of prior bad acts. When that motion was unsuccessful, Crider adjusted his trial strategy accordingly. Rather than objecting to the evidence at every turn, knowing those objections would be overruled, Crider chose to challenge the State’s use of that evidence to show that M.W.’s inconsistent testimony could be explained by domestic violence. In light of this tactical change, which was prompted by the denial of his motion in limine, Crider understandably chose not to raise repeated objections to the very evidence on which his own expert witness had based an opinion. This is precisely the circumstance in which preserving an objection via a motion in limine is of particular tactical advantage. Ingraham, ¶ 36. We conclude that the failure to object to the State’s *201 use of the evidence was within the range of competent professional assistance, particularly considered in light of Crider’s trial strategy.
¶41 Accordingly, Crider’s IAC claim must fail.
CONCLUSION
¶42 We affirm in all respects the District Court’s decision.
CHIEF JUSTICE McGRATH, JUSTICES COTTER and BAKER concur.