DA 20-0044

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 307

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JOSEPH RICHARD POLAK II,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC-15-456
Honorable Rod Souza, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

        Penelope S. Strong, Attorney at Law, Billings, Montana

      For Appellee:

        Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

        Scott D. Twito, Yellowstone County Attorney, Ann Marie McKittrick,
Ed E. Zink, Deputy County Attorneys, Billings, Montana

Submitted on Briefs:  October 20, 2021

Decided:  November 30, 2021

Filed:

_____
Clerk

FILED

11/30/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0044

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     A jury in the Thirteenth Judicial District Court, Yellowstone County, convicted Joseph Richard Polak II of deliberate homicide with a weapons enhancement.  He raises the following restated issues on appeal:

>  1. *Did the prosecutors' comments during opening and closing statements constitute plain error?*
>
>  2. *Did trial counsel provide record-based ineffective assistance of counsel (IAC)?*

¶2     We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     In the early morning hours of April 28, 2015, Polak shot and killed Scott Hofferber with a .45 caliber handgun in a trailer park in Billings, Montana.  Andrea Sattler was the only eyewitness to the shooting.  Polak fled from the scene and was arrested two days later on April 30, 2015.  The State charged Polak with Count I: Deliberate Homicide with a weapons enhancement; Count II: Tampering With or Fabricating Physical Evidence; and Count III: Criminal Endangerment.[1]  A jury convicted Polak on all three counts.

¶4     The tampering charge was based on allegations Polak disposed of the firearm he used to kill Hofferber, as the weapon was never found.  On appeal, this Court held there was insufficient evidence to support a conviction of evidence tampering and ordered the District Court to enter an order of acquittal on that charge.  *State v. Polak*, 2018 MT 174,

---

[1] The State also charged Polak with Count IV: Criminal Possession of Dangerous Drugs for methamphetamine found on his person when he was arrested on April 30, 2015.  This count was severed from the other charges and later dismissed.

¶ 39, 392 Mont. 90, 422 P.3d 112. This Court also held the District Court abused its discretion in granting the State's motion in limine to prevent Polak from introducing or discussing a glass methamphetamine pipe found in the vacant trailer Sattler was cleaning the night of the shooting. *Polak*, ¶ 23. As this evidence could have been used to impeach the testimony of Sattler that she was not high on methamphetamine at the time of the shooting and potentially impugn her perception of the events, the Court reversed the conviction for deliberate homicide and remanded the case for a new trial. *Polak*, ¶ 23. The conviction for criminal endangerment, which arose from Polak's actions during his arrest on April 30, 2015, was not challenged or reversed.

¶5     Both Polak and the State had new counsel upon remand for the retrial of the deliberate homicide charge. Polak's new trial counsel filed a motion in limine to exclude evidence of other crimes or bad acts, including Polak's prior criminal history; the events surrounding his arrest on April 30, 2015, which included evidence Polak rammed his vehicle into a law enforcement vehicle and possessed a firearm, methamphetamine, and almost $4,000 in cash; and evidence he used and sold methamphetamine. The District Court ruled the State could not introduce evidence of Polak's drug use or of committing drug-related offenses during its case-in-chief, but if Polak testified the State could ask if Polak was under the influence at the time of the shooting to impeach his credibility, and if Polak denied such drug use, the State could introduce evidence of Polak's drug use at the time of the shooting in rebuttal to undermine Polak's credibility. The court further ruled evidence of Polak's flight from the scene of the shooting was relevant, but excluded the circumstances surrounding his arrest, such as his ramming a law enforcement vehicle,

3

contraband found on his person, and any statement he made during the arrest, as the criminal endangerment charge was not being retried. The first morning of trial, the District Court reiterated this ruling and explained he would allow testimony Polak was not arrested until two days after the shooting and he was uncooperative and attempted to evade arrest, without further detail.

¶6 The State called eight witnesses in its case in chief, including Sattler, residents of the trailer park, and investigating officers. Sattler testified Polak approached her and Hofferber outside a vacant trailer she had been cleaning in the early morning hours of April 28, 2015. Hofferber and Polak exchanged a few heated words and Hofferber tried to hand a cat's paw tool to Polak when Polak pulled out a gun and shot Hofferber. Sattler denied using methamphetamine with Hofferber near the time of the shooting. A photograph of the glass methamphetamine pipe found in the vacant trailer was entered into evidence through an investigating officer. Polak's trial counsel did not question Sattler directly about the pipe but argued during closing the pipe was evidence Sattler was lying about being under the influence. Detectives testified about their investigation and the State entered into evidence extensive messages and call logs recovered from Sattler's, Hofferber's, and Polak's cellphones from the days leading up to the shooting.

¶7 Polak called three witnesses in defense, including Dr. Thomas Bennett, who performed the autopsy on Hofferber; Zach Lozier, who drove Polak from the scene of the shooting; and Polak. Dr. Bennett testified the toxicology report from Hofferber's autopsy showed potentially lethal amounts of methamphetamine in Hofferber's blood at the time of his death. Dr. Bennett explained the effects of methamphetamine include confusion,

4

violent and irrational behavior, and paranoia, and a person on methamphetamine can be awake for days at a time. Polak took the stand and relied on a justifiable use of force defense, alleging Hofferber, high on methamphetamine, came at him with the cat's paw tool and Polak shot Hofferber to save his own life. Polak claimed he had the handgun on his person when he went to the trailer court that night, because he had been target shooting at an outdoor shooting range earlier in the day. Polak denied using methamphetamine the night of the shooting. The State called Detective Ryan Kramer in rebuttal, who testified Polak was not at the shooting range on the day of the shooting based on the location data from Polak's cellphone.

¶8 After the five-day trial, a jury again convicted Polak of deliberate homicide with a weapons enhancement. The District Court sentenced Polak to sixty years for deliberate homicide, with an additional ten years for the weapons enhancement to run consecutive to any previous sentences. Polak appeals. Additional facts are discussed as necessary.

**STANDARD OF REVIEW**

¶9 Failure to contemporaneously object to alleged prosecutorial misconduct during opening or closing statements generally constitutes waiver of the wright to raise that issue on appeal. *See State v. Haithcox*, 2019 MT 201, ¶ 23, 397 Mont. 103, 447 P.3d 452; *State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799; *State v. Hayden*, 2008 MT 274, ¶ 17, 345 Mont. 252, 190 P.3d 1091. We may undertake review of an unpreserved assertion of error under the plain error doctrine in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of

5

the proceedings, or compromise the integrity of the judicial process. *McDonald*, ¶ 8. Invoking plain error review to reverse a conviction is a discretionary decision this Court uses sparingly on a case-by-case basis. *See McDonald*, ¶ 8.

¶10 IAC claims are mixed questions of law and fact we review de novo. *Whitlow v. State*, 2008 MT 140, ¶ 9, 343 Mont. 90, 183 P.3d 861.

## DISCUSSION

¶11 *1. Did the prosecutors' comments during opening and closing statements constitute plain error?*

¶12 Polak argues this Court should reverse his conviction for deliberate homicide because the State engaged in prosecutorial misconduct in its opening and closing statements and that misconduct constitutes plain error. Polak maintains the State's opening and closing statements violated the District Court's order on the defense's motion in limine, which prohibited the State from introducing evidence of Polak's drug use or other drug-related offenses in its case-in-chief. Polak argues the State's primary theme of the case about "a world in Billings that is foreign to most of us," in which "people use methamphetamine" and "are up and about in the middle of the night" was blatantly prejudicial and implied Polak too used and possibly dealt drugs and was an attempt to appeal to jurors' prejudice against the evil of drugs in the community. Polak maintains the State inappropriately primed the jurors on this theme from voir dire all the way through its rebuttal.

¶13 Pursuant to the court's order, the State could not introduce evidence of Polak's drug use or of committing drug-related offenses during its case-in-chief. If Polak testified,

6

however, the State could ask if Polak was under the influence at the time of the shooting to impeach his credibility, and if Polak denied such drug use, the State could introduce evidence of Polak's drug use at the time of the shooting in rebuttal to undermine Polak's credibility.

¶14 During voir dire, both the State and defense counsel questioned potential jurors about the negative effects of methamphetamine on the Billings community. In its opening argument, the State told the jury:

> In the next few days, we're going to talk about a world that many of you are probably not familiar with. It's a world that exists right here in Billings, but it might as well be in a separate universe, because it's so different than what most of us know.
> In this world people use methamphetamine. In this world people are up and about in the middle of the night when most people are home sleeping in their beds. In this world people make really bad decisions, do things that don't make sense. In this world the Defendant had the street name of Ghost, that's how his friends knew him by, is Ghost.

¶15 The State later summed up in closing:

> We told you at the beginning of this case that we were going to talk about a world in Billings that is foreign to most of us in this room. To those of us who get up in the morning and take care of our kids and go to work and do what society expects of us, this world where people are out at 2:30 in the morning and just getting started in their morning and their night, is foreign to the rest of us. But that is the world that Joe Polak, this Defendant, lived in throughout this timeframe.
> What this case turns on is the testimony of several people, but really on two and the physically [sic] evidence and the science: Andrea Sattler, the police investigation, and the Defendant.
> No one expects you to like Andrea Sattler. Look, she made some pretty terrible decisions that night. And no one is asking you to approve of them or the way she lived her life, or the way that Jennifer McGraw lived her life, maybe even Alicia Armbruster.

. . .

7

Andrea who has been castigated with almost no boundaries over this entire week for the way she lived her life and the choices she made after she saw Scotty murdered in front of her eyes, was the one that he was sweet on in those two weeks. 65 text messages between them just in the 24 hours leading up to Scotty's death.

When you go into your deliberations, don't let there be any equivalency between the choices that Andrea made that night, such as deciding to hide out in the trailer and come out and speak to police, don't let those choices be made to be equivalent with the choices the Defendant made that night and the next two days. They are not remotely the same thing.

¶16 In her closing argument, defense counsel argued Sattler's testimony could not be trusted because her "memory is skewed and foggy and messed up, irrational because of the fact that she was on methamphetamine at the time" of the shooting. Trial counsel emphasized Sattler had texted a friend to come smoke with her shortly before the shooting occurred and a methamphetamine pipe was found in the trailer Sattler was cleaning. Trial counsel emphasized the high levels of methamphetamine found in Hofferber's body and asked the jury to "uphold our constitutional right to protect ourselves against a meth crazed maniac wielding a weapon."

¶17 In rebuttal, the State asked rhetorically, "In April 2015, when did [Polak] sleep?" It then recounted the testimony of the witnesses and Polak's phone activity, which showed Polak hung out with Sattler and Hofferber all night on April 26 and was awake all day on April 27 before showing up at the trailer park at 2:30 a.m. on April 28 and shooting Hofferber. The State concluded:

I asked him yesterday if he was under the influence of meth as my last question and he said no. When does this man sleep? Dr. Bennett told you, their witness, who no longer works for the State of Montana, people who use meth are up for days, so was he.

People who use meth are paranoid and see things that aren't real, and are violent and aggressive. You do the math. His story is a lie. Hold him accountable for the death of Scott Hofferber.

Trial counsel did not object during the State's opening or closing arguments.

¶18 "A prosecutor's misconduct may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial." *Hayden*, ¶ 27. When the defendant claims a prosecutor's remarks violated his right to a fair trial, but the challenged remarks do not implicate another right of the accused such as the right to counsel or the right to remain silent, our analysis focuses on whether the challenged statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Haithcox*, ¶ 24 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181-82, 106 S. Ct. 2464, 2471-72 (1986)); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43, 94 S. Ct. 1868, 1871 (1974). In making this determination, we consider the context of the entire proceedings. *McDonald*, ¶ 10; *see also Donnelly*, 416 U.S. at 643, 94 S. Ct. at 1871. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Haithcox*, ¶ 24, (quoting *Darden*, 477 U.S. at 181, 106 S. Ct. at 2471). We will not presume the alleged prosecutorial misconduct prejudiced the defendant. Rather, the defendant has the burden of showing the prosecutor's remarks violated his substantial rights. *Haithcox*, ¶ 24; *McDonald*, ¶ 10. "A prosecutor's argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness's testimony under the principles set forth in the jury instructions." *State v. Aker*, 2013 MT 253, ¶ 27, 371 Mont. 491, 310 P.3d 506.

9

¶19    The posture of this case upon remand is part of the context to consider.  This Court reversed and remanded Polak's deliberate homicide conviction for a new trial in his first appeal because the District Court abused its discretion in prohibiting the defense from impeaching Sattler's credibility with the glass methamphetamine pipe found at the scene as evidence she was under the influence of methamphetamine at the time of the shooting. It was not improper for the State to highlight many of its witnesses lived lifestyles that involved drug use and to prepare the jury for the expected focus of the defense on Sattler's alleged methamphetamine use and Hofferber testing positive for high levels of methamphetamine at the time of his death.  The State's opening statement did not directly allege Polak used methamphetamine.  Rather, the State sought to explain its witnesses' actions in the aftermath of the shooting and dismiss any potential concerns of the jury that believing Sattler's testimony was an endorsement of her lifestyle or choices.  The State properly reiterated this in its closing arguments.

¶20    The State did not raise Polak's drug use until its rebuttal to the defense's closing argument.  The State's rebuttal focused on multiple discrepancies in Polak's account of the evening.  The State argued the jurors could infer from the evidence in the record about the effects of methamphetamine and Polak's behavior that Polak was also under the influence of methamphetamine at the time of the shooting.  This was a permissible inference that could be drawn from the evidence presented and the prosecutor did not engage in prosecutorial misconduct to highlight it for the jury.  It is proper for a prosecutor to suggest inferences the jury could permissibly draw from the evidence presented.  *McDonald*, ¶ 14. Nor was it in violation of the motion in limine, which allowed the State to rebut Polak's

10

denial of methamphetamine use at the time of the shooting with contradictory evidence to impeach Polak's credibility. There is no plain error as there is no manifest miscarriage of justice, question of fundamental fairness, or compromise of the integrity of the judicial process when the prosecutor's challenged statements were proper.

¶21    *2. Did trial counsel provide record-based IAC?*

¶22    Polak argues his counsel made four significant errors in her representation of him: (1) she failed to object to or seek a mistrial after the State's opening and closing statements referencing "a world" the jury was "probably not familiar with" where "people use methamphetamine"; (2) she did not seek a continuance to properly vet cellphone location data or voir dire the detective discussing the data for his expert qualifications; (3) she failed to lay out evidentiary issues for the District Court in a trial brief, which led to her failure to present evidence of Hofferber's violent nature and experience as a mixed martial arts (MMA) fighter; and (4) she gave Polak incorrect legal advice, leading him to withdraw his counteroffer for a plea deal. Polak contends these alleged failures are suitable for review on direct appeal because counsel admitted to her shortcomings in the sentencing memorandum she filed before the District Court. Polak also appears to contend some of counsel's errors are suitable for review on direct appeal because there is no plausible justification for counsel's actions.

¶23    The Sixth Amendment to the United States Constitution, as applicable to the states through the Fourteenth Amendment, and Article II, Section 24, of the Montana Constitution, guarantee criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 2063 (1984); *Whitlow*,

11

¶ 10. "To show IAC, a defendant must prove both (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense." *State v. Crider*, 2014 MT 139, ¶ 34, 375 Mont. 187, 328 P.3d 612. The defendant must overcome the strong presumption an attorney's conduct falls within the wide range of reasonable professional service and constituted sound trial strategy. *Crider*, ¶ 34. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." *Crider*, ¶ 34.

¶24 The question whether counsel's conduct was based on the exercise of reasonable professional judgment generally requires this Court to ask why counsel did or did not take a particular action. "IAC claims may be brought on direct appeal when the record sufficiently answers why counsel did or did not take a particular action." *State v. Ward*, 2020 MT 36, ¶ 18, 399 Mont. 16, 457 P.3d 955; *State v. Hinshaw*, 2018 MT 49, ¶ 21, 390 Mont. 372, 414 P.3d 271. If the record does not evidence why counsel took or did not take a particular action, IAC claims may be more appropriate for review in a petition for postconviction relief where a record can be developed. *Ward*, ¶ 18.

¶25 We will also consider IAC claims on direct appeal when the issue involves an obligatory, non-tactical action, or there is no plausible justification for defense counsel's action. *Crider*, ¶ 36; *State v. Kougl*, 2004 MT 243, ¶ 15, 323 Mont. 6, 97 P.3d 1095. In such cases the question is whether counsel acted, and if so, did counsel act adequately. *Crider*, ¶ 36. We have explained "[s]uch situations are 'relatively rare.'" *Crider*, ¶ 36 (quoting *Kougl*, ¶ 15).

¶26 In *Trull*, this Court addressed an ineffective assistance of counsel claim on direct appeal, when trial counsel moved for a new trial before the district court, alleging her own ineffectiveness and submitted an affidavit to the district court explaining her allegedly deficient actions at trial. *State v. Trull*, 2006 MT 119, ¶ 26, 332 Mont. 233, 136 P.3d 551. The district court denied Trull's motion and Trull appealed that decision to this Court. We reviewed the IAC claims on direct appeal as the record, namely counsel's motion for new trial and supporting affidavit, sufficiently explained counsel's actions and inactions to allow for appellate review. *Trull*, ¶ 26.

¶27 In arguing his claims are record-based, Polak relies heavily on the sentencing memorandum trial counsel filed with the District Court. In this memorandum counsel lists "things, I as Mr. Polak's lawyer wish I would have done," such as offering a lesser included offense of mitigated deliberate homicide, seeking a mistrial "each time the State mentioned Mr. Polak was on drugs," revisiting plea negotiations before closing arguments, requesting the State provide discovery again after she took over the case to confirm her file was complete, and failing to object when the State mentioned Polak disposed of the gun and Polak did not call law enforcement after the shooting. Trial counsel does not explain in the sentencing memorandum why she took or failed to take these actions. Trial counsel does posit in the sentencing memorandum she failed to ask "Polak what he knew about Mr. Hofferber during our case," because she was "[a]dmonished so intensely during the State's case in chief." Trial counsel did not allege she was ineffective in the sentencing memorandum. Rather, she provided the alleged errors as information the District Court should consider in determining an appropriate sentence for Polak. Importantly, counsel

did not file a motion for a new trial based on her alleged errors and ineffective representation nor did she file a sworn affidavit explaining her allegedly deficient actions or inactions, and the District Court was not given the opportunity to determine whether counsel's representation was ineffective. Unlike in *Trull*, trial counsel did not create a sufficient record in her post-trial filings to explain why she acted or did not act to allow this Court to review Polak's IAC claims on direct appeal.

¶28 Turning to Polak's specific allegations of IAC, we consider whether the record otherwise explains counsel's allegedly ineffective actions or inactions or whether the action falls under the narrow exception of an action for which there is no plausible justification.

¶29 Polak first contends trial counsel was ineffective when she failed to object to or seek a mistrial after the State's opening and closing statements referencing "a world" the jury was "probably not familiar with" where "people use methamphetamine." As discussed under Issue 1, the prosecutor's statements were not improper. The State properly sought to contextualize the actions of its witnesses and the victim and prepare the jury for the expected focus of Polak's defense on the use of methamphetamine by the victim and the only eyewitness to the shooting. While we have acknowledged alleged omissions on the part of trial counsel are "usually not well-suited for consideration on direct appeal," *Ward*, ¶ 18, such allegations are record-based and can be reviewed on direct appeal when the alleged omission is an objection or motion that would not have been meritorious under the circumstances. It is not IAC for counsel to fail to make motions that lack merit. *See Heddings v. State*, 2011 MT 228, ¶ 33, 362 Mont. 90, 265 P.3d 600 ("[A] claim of constitutionally ineffective assistance of counsel will not succeed when predicated upon

14

counsel's failure to make motions or objections which, under the circumstances, would have been frivolous, which would have been, arguably, without procedural or substantive merit, or which, otherwise, would likely not have changed the outcome of the proceeding."). Trial counsel did not provide IAC when she failed to seek a mistrial based on the State's opening and closing statements, as the District Court properly would have denied such motion.

¶30 Polak next contends trial counsel was ineffective when she did not seek a continuance to properly vet cellphone location data or voir dire the detective discussing the data for his expert qualifications. During its investigation of the homicide, the State found two cellphone numbers were associated with Polak near the time of the shooting. The first cellphone was never recovered, but the State was able to retrieve data about that phone from the carrier. This first cellphone was in use before the shooting, but all activity ceased on that phone at 9:26 p.m. on April 28, 2015, the evening after the early morning shooting. The second cellphone was on Polak's person when he was arrested. This phone was activated on April 29, 2015, at 3:38 p.m. The State also recovered data from other witnesses' cellphones, including Sattler. During pretrial discussions on the first day of trial, trial counsel told the court she did not believe she had the data from Polak's second cellphone, which was activated after the shooting. The State provided her with a disc after the discussion but maintained all discovery had been given to the Office of the Public Defender previously. On the third day of trial, trial counsel contended she did not have all the data from Sattler's cellphone. The State provided her with the disc after the discussion, again maintaining all discovery had been made available to the Office of the Public

Defender. After the defense closed, the State called Detective Ryan Kramer as a rebuttal witness to discredit Polak's contention he had the gun on his person when he went to the trailer park the night of the shooting because he had been target shooting earlier that day. Kramer testified Polak's cellphone never pinged off the cell tower near the shooting range and he would have expected the cellphone to ping off that tower if Polak was at the shooting range when he claimed he was. Citing this rebuttal testimony, Polak faults his trial counsel for not seeking a continuance to vet missing cellphone data. But the data discussed by Kramer was from Polak's first cellphone, not the second cellphone or Sattler's cellphone. The record does not show whether trial counsel had received the location data from the first cellphone or not. And while trial counsel did not object to Kramer as a rebuttal witness and did not voir dire him on his expertise in cellphone location data, she did elicit the concession from Kramer on cross-examination he was not a subject matter expert on cellphone towers. Without more, this record is not sufficient for us to determine whether counsel's performance was ineffective on this issue, as the record does not explain why trial counsel acted as she did and justifiable strategic reasoning could exist for counsel's decision not to voir dire the witness and further highlight his experience. Consideration of this IAC issue, if at all, is through a petition for postconviction relief where a record can be more fully developed, rather than through this direct appeal.

¶31 Next, Polak argues his trial counsel failed lay out evidentiary issues for the District Court in a trial brief, which led to the District Court addressing evidentiary issues in an ad hoc manner as they arose and ultimately, to her failure to present evidence of Hofferber's violent nature and experience as an MMA fighter. During final pretrial discussions shortly

before voir dire began, the District Court ruled Polak had to first lay a foundation he acted in self-defense before he could introduce evidence of the violent character of the victim. The court explained Polak could then testify about his personal knowledge of Hofferber's past violent conduct that led him to fear Hofferber and use the level of force employed. When Polak took the stand, trial counsel failed to elicit testimony from Polak he knew Hofferber had a violent reputation and was a former MMA fighter, which caused him to fear Hofferber. In her post-trial sentencing memorandum, trial counsel posits she failed to ask Polak about the circumstances of his fear because she previously had been "[a]dmonished so intensely" by the District Court during the State's case in chief to stop questioning the State's witnesses about Hofferber's reputation for violence and background as an MMA fighter. But the sentencing memorandum is not a sworn affidavit. Without more, the record on this issue is not sufficient for review on direct appeal. Again, this IAC issue is more appropriate for review in a petition for postconviction relief where the record may be more fully developed.

¶32    Finally, Polak contends his trial counsel was "per se ineffective" when she gave him incorrect legal advice that led him to withdraw his counteroffer for a plea deal shortly before trial. Polak rightly points out the Sixth Amendment right to counsel "extends to the plea-bargaining process." *State v. Rose*, 2017 MT 289, ¶ 19, 389 Mont. 374, 406 P.3d 443 (quoting *Lafler v. Cooper*, 566 U.S. 156, 162, 132 S. Ct. 1376, 1384 (2012)). In his briefing on appeal, Polak contends his counsel misread the court's order on his motion in limine as excluding all evidence of his apprehension on April 30 and incorrectly informed him negligent homicide was a lesser included offense for his deliberate homicide charge. He

17

claims he withdrew his counteroffer based on this advice. The District Court granted Polak's motion in limine in part. The court's ruling allowed the State to introduce evidence Polak had fled from the scene of the shooting on April 28 and was uncooperative when he was apprehended two days later on April 30, while excluding evidence Polak struck a police vehicle in an attempt to escape; Polak had a gun, methamphetamine, and a substantial amount of cash on his person; and any statements Polak made to the officers during his arrest. Shortly after the District Court reiterated this ruling in Polak's presence on the first day of trial, Polak confirmed he believed it was in his best interest to reject any plea offers and go to trial. He explained to the District Court "that with the ruling on the Motion in Limine, that [he] was provided an opportunity to get the truth out in this trial, that without it being obfuscated by the events of the 30th." In her unsworn sentencing memorandum, trial counsel alleged Polak would not have withdrawn his counteroffer had he known negligent homicide was not an available lesser included offense in his case. Without further development of the record, this Court cannot determine what allegedly incorrect legal advice trial counsel gave to Polak before he decided to withdraw his counteroffer and whether that advice was "per se ineffective." Further, there is no evidence the State was seriously considering his counteroffer before he withdrew it. *See Rose*, ¶ 19 ("[A] defendant must show that but for the ineffective assistance of counsel there is 'a reasonable probability that the plea offer would have been presented to the court.'" (quoting *Lafler*, 566 U.S. at 164, 132 S. Ct. at 1385)). The record is insufficient to address

18

this issue on direct appeal[2] and is likewise more appropriate for review in a petition for postconviction relief.

**CONCLUSION**

¶33     Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR

---

[2] In his reply brief, Polak concedes the record is not sufficient to address whether trial counsel provided IAC in the plea-bargaining process but proposes an "unprecedented" procedure: He asks this Court to stay this appeal and allow counsel to file a motion for new trial premised on IAC in the District Court. At this juncture, however, a motion for a new trial would be untimely. Such a motion must be filed within 30 days of a verdict or finding of guilty. *See* § 46-16-702(2), MCA. The verdict in this case was issued more than two years ago on April 12, 2019. As indicated above, if consideration of this IAC claim is appropriate, it is through postconviction relief, rather than direct appeal.