Chief Justice Mike McGrath delivered the Opinion of the Court.
***106 ¶1 Timothy Craig Haithcox appeals from his jury conviction for aggravated assault, aggravated kidnapping, tampering with a witness, and misdemeanor assault entered in the First Judicial District Court, Lewis and Clark County. We affirm.
*456 ¶2 Haithcox raises the following issues for review:
1. Whether evidence involving Haithcox's prior conduct was admitted in violation of the Montana Rules of Evidence.
2. Whether the introduction of racial slurs exploited racial prejudice, resulting in prosecutorial misconduct.
3. Whether the investigators' extraction of the entire contents of Haithcox's cellphone exceeded the scope of the search warrant.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 In early 2016, Haithcox introduced himself, under the pseudonym Timothy Smith, to Arleen Hibbard on the dating website Plenty of Fish. At the time, Hibbard lived in East Helena, Montana, and Haithcox was living in Michigan. Their relationship intensified quickly and Haithcox expressed his desire to visit Hibbard in East Helena. Haithcox was complimentary of Hibbard, told her he loved her, and that he wanted to marry her. Haithcox told Hibbard he had worked for Georgia Pacific for twenty-eight years but that his company was relocating, and he would like to use his severance to move to East Helena. Haithcox asked Hibbard to buy him a train ticket from Michigan to Montana, expressing that he would pay her back when he received his severance. When Hibbard purchased the train ticket, he told her that his last name was Smith-Haithcox but that she should just use the name Haithcox for the ticket. Approximately one month after they met online, Hibbard picked Haithcox up in Shelby, Montana, brought him back to her home, and Haithcox began living with her.
¶4 While Hibbard worked, Haithcox would use her vehicle, explaining that he needed it in order to network and find employment. Shortly after he arrived, Haithcox told Hibbard he needed to return to Michigan to retrieve his pension and severance pay. When Haithcox assured Hibbard he would pay her back, she purchased him a plane ticket and gave him traveling money.
¶5 After Haithcox returned from Michigan, he allegedly started drinking more and became verbally aggressive towards Hibbard. His financial dependence on Hibbard also worsened. Hibbard paid for all ***107 household expenses and groceries, as well as Haithcox's phone bill and clothing. On one occasion, when Hibbard received a larger than average phone bill, she discovered that Haithcox had been communicating with a woman in Nova Scotia and numerous other women in Montana. When Hibbard confronted Haithcox about the calls, he explained that he was only networking. Another time, Haithcox told Hibbard that he was going to work an event in Lincoln, Montana, with the wife of a local casino owner. After the woman picked Haithcox up, Hibbard discovered that the woman was not the casino owner's wife. Haithcox did not return that night as promised and when Hibbard confronted him about it the next day, he was dismissive and coarse with her.
¶6 On April 7, 2016, Haithcox told Hibbard he was going to the grocery store and would be right back. Despite an alleged agreement between Haithcox and Hibbard that he would no longer drive her car while intoxicated, he drove to a nearby bar. Haithcox called Hibbard from the bar, called her names, and when he wouldn't stop, Hibbard hung up. Hibbard testified this was a reoccurring pattern in their relationship. Haithcox called back, asking for Hibbard's help because some "white boys" were threatening to beat him up. Hibbard walked to the bar, picked Haithcox up, and the two returned home. When they got home, Hibbard recorded a particularly volatile exchange between the two during which Haithcox got "in [Hibbard's] face" and called her vulgar names. In the recording, Haithcox calls Hibbard, who is of Caucasian and Native American heritage, a "police bitch," "white bitch from hell," "gump," and a "grimy ass Indian," among other names. Throughout the recording, Haithcox also yells, "[y]ou're nothing" at Hibbard approximately thirty-five times. At trial, Hibbard testified, "[h]e called me a nigger all the time, a fucking white bitch, a raggedy-ass ho bag bitch, a pink bitch, a cop police bitch, gump."
¶7 After the fight, Haithcox apologized to Hibbard and repeatedly told her he loved her and wanted to be with her. On April 11, 2016, while Hibbard was at work, they exchanged *457 text messages and agreed that while they had issues, they loved one another and wanted to be together. Haithcox asked her to bring cash home for him, which she did. When she came home from work, Haithcox had prepared dinner for them and, according to Hibbard, "he was very attentive, very loving, huggy, kissy, supper was ready. [It was] [a]n idyllic situation." Haithcox left around 6:30 p.m. to meet someone but told Hibbard he would not be gone long. However, around 7:00 p.m., Haithcox called Hibbard from a bar, explaining he had lost the money she gave him and needed money to pay his tab. Hibbard brought him money, ***108 Haithcox told her loved her and would be home soon, and she returned home. When Haithcox did not return, Hibbard sent a text asking when he would be home. Haithcox called her from the bar, called her vulgar names, and she hung up.
¶8 Hibbard testified that around 9:30 p.m., Haithcox called again, this time asking for directions home. She responded that she would find directions online and call him back. While Hibbard was rebooting her modem to get her internet working, Haithcox arrived at the house. According to Hibbard, when he saw her rebooting the modem, he believed she was calling the police and became angry. Haithcox hit Hibbard on the side of her head, knocking her glasses off. He then followed Hibbard to her bedroom "yelling and raging." According to Hibbard's testimony, Haithcox grabbed her right ankle and began "pulling ... twisting, yanking, and jerking on it," aware that she recently had her right knee replaced. Hibbard testified that she begged him to stop but he pulled her onto the floor and kicked her so hard in between her legs that she lost control of her bladder. According to Hibbard, Haithcox threatened to kill her and bash her skull in. She then went into the bathroom and locked the door. When Haithcox realized Hibbard had her phone with her, he kicked the door in and threatened to pour bleach over her. Haithcox allegedly kicked Hibbard, causing her to fall between the toilet and the bathtub. She testified that each time she tried to get up, he would kick or shove her into the shower, and she would fall and hit her head on the bathtub. He proceeded to bash her head into the wall "over and over and over," hit her head off of the medicine cabinet, urinated on her face, and strangled her unconscious at least four times. The assault continued for several hours, with Haithcox threatening to kill Hibbard with a knife and various other objects.
¶9 Around 2:00 a.m., Haithcox made Hibbard go to bed with him. Hibbard testified that she planned to lie there only until Haithcox fell asleep, but because she had previously taken a sleeping pill, she fell asleep. According to Hibbard, she awoke around 6:00 a.m. and took pictures of her injuries and the damage done to her home. She hoped that if he saw the pictures, "maybe he would just straighten up and not be that way, stop drinking." Despite the assault, Hibbard still wished to repair the relationship.
¶10 Fearing that the gash on her head needed medical attention, Hibbard decided to go to the hospital. Hibbard went to her vehicle and, as she waited for the car to warm up, she texted Haithcox's brother, Brian, about the assault. Approximately fifteen minutes later, Haithcox came out of the house and got into the vehicle with Hibbard.
***109 Haithcox told Hibbard he loved her, and that he wanted to take care of her and nurse her back to health. Haithcox eventually convinced her to come back into the house, but she quickly changed her mind and returned to the car. Haithcox got back into the vehicle with her and begged her not to go to the hospital. Haithcox allegedly told Hibbard that she needed to cover the marks on her neck and, if she did go to the hospital, to say she was injured at a bar. A neighbor witnessed Hibbard and Haithcox sitting in Hibbard's vehicle for several hours. The neighbor testified that throughout the day she saw Haithcox banging on the car door trying to get inside the car; Haithcox and Hibbard arguing inside of the car; and Hibbard laying her head on Haithcox's shoulder crying. Eventually, around 4:00 p.m., Hibbard went to the hospital. The hospital contacted law enforcement and two detectives arrived at the hospital to interview Hibbard.
¶11 When Hibbard left for the hospital, Haithcox called Millie Follet, a woman he *458 met on Plenty of Fish, and asked her for a ride to a friend's house. The next day, Haithcox called Lisa Hampa, whom he had also met on Plenty of Fish, and asked Hampa if he could come to Missoula and live with her. Hampa agreed and drove from Missoula, Montana, to Helena to pick him up. Haithcox allegedly told both Follet and Hampa that he needed a ride because he had lost his longtime job with ExxonMobil and the company had taken away his company vehicle and housing. On April 14, 2016, law enforcement arrested Haithcox at Hampa's home in Missoula.
¶12 Haithcox was eventually transported back to Helena and, on March 17, 2017, a jury convicted him of aggravated assault, aggravated kidnapping, tampering with a witness, and misdemeanor assault. Haithcox appeals.
DISCUSSION
¶13 1. Whether evidence involving Haithcox's prior conduct was admitted in violation of the Montana Rules of Evidence.
Standard of Review
¶14 This Court reviews a district court's ruling regarding the admission of other crimes, wrongs, or acts for an abuse of discretion. State v. Crider , 2014 MT 139, ¶ 14, 375 Mont. 187, 328 P.3d 612. To the extent that the trial court's ruling is based on an interpretation of a rule of evidence or a statute, however, this Court's review is de novo. State v. Lotter , 2013 MT 336, ¶ 13, 372 Mont. 445, 313 P.3d 148.
¶15 Before trial, Haithcox filed a motion in limine seeking to exclude ***110 certain evidence concerning his relationships with other women, evidence showing he used a false name and repeatedly lied about his past employment, evidence of his consumption of alcohol, and evidence regarding the financial aspect of his and Hibbard's relationship. He also asserted that the introduction of explicit details of his and Hibbard's arguments, specifically the offensive names he called her, were unnecessary and unfairly prejudicial. Haithcox objected to the evidence on the ground that it was impermissible character evidence in violation of M.R. Evid. 402, 403, and 404(b). The District Court disagreed, reasoning that the evidence fell primarily under the purview of the transaction rule, and even if Rule 404(b) did apply, the risk of unfair prejudice did not substantially outweigh the evidence's probative value.
¶16 On appeal, Haithcox reasserts that evidence introduced by the prosecution concerning his prior conduct was unfairly prejudicial, violated M. R. Evid. 404(b) and 403, and was improperly admitted under the transaction rule. The Montana Rules of Evidence provide that evidence of a person's previous crimes, wrongs, or acts are "not admissible to prove the character of a person in order to show action in conformity therewith." M. R. Evid. 404(b). Evidence of prior behavior may, however, be admissible for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M. R. Evid. 404(b). This Court has previously explained that "the use of prior bad acts evidence to prove the commission of the crime at issue (or 'actus reus') does not necessarily run afoul of 404(b). Rather, the rule prohibits a theory of admissibility: Using propensity evidence to draw 'the inference from bad act to bad person to guilty person.' " Crider , ¶ 24 (citation omitted). In conjunction with Rule 404(b), Rule 403 sets forth a fact-specific balancing test that allows for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403. Further, "[e]ven if evidence is potentially unfairly prejudicial, the Rule 403 balancing test favors admission-the risk of unfair prejudice must substantially outweigh the evidence's probative value." State v. Madplume , 2017 MT 40, ¶ 33, 386 Mont. 368, 390 P.3d 142.
¶17 The transaction rule, on the other hand, is a statutory provision distinct from Rule 404(b) and sets forth an exception to the 404(b) bar on prior conduct. The text of the transaction rule reads: "Where the declaration, act, or omission forms part of a *459 transaction ***111 which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Section 26-1-103, MCA. In practice, the rule recognizes the "legitimacy of admitting properly limited evidence that is 'intrinsic to' or 'inextricably intertwined with' a charged crime" in order to provide "a comprehensive and complete picture of the commission of a crime." State v. Guill , 2010 MT 69, ¶¶ 28, 36, 355 Mont. 490, 228 P.3d 1152 (citations omitted). Transaction evidence is admissible because "it is theoretically difficult to subdivide a course of conduct into discrete criminal acts and 'other' conduct and ... it is difficult for a witness to testify coherently to an event if the witness is only permitted to reference the minutely defined elements of the crime." Guill , ¶ 27. While the transaction rule is separate from Rule 404(b), this Court has previously explained that the transaction rule may not be used to admit propensity evidence that would otherwise be excluded by Rule 404(b). Guill , ¶ 26 ; State v. Berosik, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776. Further, evidence admissible under the transaction rule is similarly subject to fact-specific balancing under Rule 403. Guill , ¶ 26.
¶18 The evidence objected to was properly admitted under the transaction rule and the risk of unfair prejudice did not substantially outweigh its probative value. Similar to this Court's analysis in Guill , we conclude that the transaction at issue "is both temporally and factually broad," and therefore encompasses specific aspects of Haithcox's behavior dating back to the beginning of the relationship. Guill , ¶ 30. Evidence concerning Haithcox's contemporaneous relationships with other women, evidence showing he used a false name and repeatedly lied about his past employment, evidence of his consumption of alcohol, and evidence regarding the financial aspect of his and Hibbard's relationship were important to establish the source of tension building up to the assault. Without this information, the jury may have had difficulty comprehending Haithcox's motive behind the near deadly assault. Consistent with the foundation of the transaction rule, the prior conduct Haithcox finds objectionable is "inextricably intertwined" with the charged assault. Guill , ¶ 30.
¶19 Furthermore, the prosecution used evidence of Haithcox's prior conduct not to establish his propensity for assault, but to provide necessary context and clarify for jurors the reasoning behind Hibbard's otherwise perplexing behavior. At trial, the defense focused on undermining Hibbard's credibility by emphasizing the fact that she claimed to have been brutally assaulted, yet she spent approximately thirty minutes the next morning taking pictures, fifteen minutes ***112 warming up her car, and didn't immediately go to the police station, which was within walking distance from her home. The District Court correctly determined that the facts Haithcox wished to exclude from evidence were inextricably intertwined with the assault because it shed light on both the atmosphere of abuse and manipulation that had developed, and Hibbard's resulting behavior. "Abuse within intimate relationships often follows a pattern known as the cycle of violence, 'which consists of a tension building phase, followed by acute battering of the victim, and finally by a contrite phase where the batterer's use of promises and gifts increases the battered woman's hope that violence has occurred for the last time.' " Hernandez v. Ashcroft , 345 F.3d 824, 836 (9th Cir. 2003) (citation omitted). At trial, Detective William Pandis testified that a similar pattern had emerged in Haithcox and Hibbard's relationship. The prosecution introduced the evidence at issue to demonstrate a pattern in the relationship which left Hibbard simultaneously fearful and hopeful that Haithcox would change, which explained why Hibbard would not have immediately contacted the police. The evidence was used to illustrate the complexity of Hibbard's behavior and, in turn, maintain her credibility. Without candid insight into the nature of Haithcox and Hibbard's relationship, including Haithcox's verbal abuse and financial manipulation, the jury would have received an incomplete, and potentially misleading, narrative.
¶20 Regarding Haithcox's obscene insults specifically, although recounting the expletives verbatim before the jury had the *460 potential to be prejudicial, they were relevant to establish motive and the risk of unfair prejudice did not substantially outweigh the evidence's probative value. Haithcox's verbal abuse had become a strain on the relationship and demonstrated his hostility towards Hibbard. The state of their relationship, and Haithcox's history of using derogatory language to demean Hibbard, exhibited his motive for the April 11, 2016 assault. Testimony concerning Haithcox's lies to Follet and Hampa following the assault were also admissible. Haithcox's efforts to quickly leave Hibbard's home and Helena and his use of lies to enlist the help of others demonstrated consciousness of guilt and reinforced Hibbard's allegations.
¶21 Finally, "[a] limiting instruction generally cures any unfair prejudice." State v. Blaz , 2017 MT 164, ¶ 20, 388 Mont. 105, 398 P.3d 247 (quoting State v. Hantz , 2013 MT 311, ¶ 44, 372 Mont. 281, 311 P.3d 800 ). At trial, the jurors were specifically instructed that evidence of Haithcox's prior conduct was not admitted in order to prove his character or to establish that he acted in conformity with his prior ***113 actions. In light of the above, the introduction of evidence concerning Haithcox's prior conduct did not amount to an abuse of discretion. The court correctly applied the transaction rule and fulfilled its gatekeeping function under Rule 403 through weighing the evidence before authorizing the jury to consider it.
¶22 2. Whether the introduction of racial slurs exploited racial prejudice, resulting in prosecutorial misconduct.
Standard of Review
¶23 This Court generally does not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial. State v. Longfellow , 2008 MT 343, ¶ 24, 346 Mont. 286, 194 P.3d 694. This Court may, however, invoke plain error review and consider an unpreserved claim alleging prosecutorial misconduct in situations implicating a defendant's fundamental constitutional right and when failure to review the alleged error may result in a manifest miscarriage of justice, leaving unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. State v. Aker , 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506. The decision to invoke plain error review is a discretionary one, to be invoked "sparingly, on a case-by-case basis, according to narrow circumstances, and by considering the totality of the circumstances." Aker , ¶ 21 ; State v. Williams , 2015 MT 247, ¶ 16, 380 Mont. 445, 358 P.3d 127.
¶24 Both the Sixth Amendment to United States Constitution, and Article II, Section 24, of the Montana Constitution, guarantee criminal defendants "the right to a fair trial by a jury." State v. Hayden , 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091. "A prosecutor's misconduct may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial." State v. McDonald , 2013 MT 97, ¶ 10, 369 Mont. 483, 299 P.3d 799 (quoting Hayden , ¶ 27 ). However, this Court will not presume prejudice from the alleged prosecutorial misconduct. Rather, the "defendant must show that the argument violated his substantial rights." McDonald , ¶ 10 (quoting State v. Makarchuk , 2009 MT 82, ¶ 24, 349 Mont. 507, 204 P.3d 1213 ). Furthermore, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright , 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citation omitted). Rather, the relevant question is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."
***114 Darden , 477 U.S. at 181, 106 S. Ct. at 2471 (quoting Donnelly v. DeChristoforo , 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) ).
¶25 Although Haithcox failed to properly preserve this issue for appeal, he requests that this Court invoke plain error review and assess whether the prosecutor exploited racial prejudice, resulting in prosecutorial misconduct. Specifically, Haithcox maintains that the prosecutor unnecessarily repeated and emphasized racial slurs he used against Hibbard and slurs his brother used against him, in addition to evoking racial stereotypes to inflame the jury. Despite *461 Haithcox's failure to preserve this issue on appeal, the severity of the allegations warrants plain error review.
¶26 As discussed above, the racial slurs Haithcox used against Hibbard were relevant and admissible under the transaction rule to provide necessary context for jurors. The focus of the testimony was the demeaning nature of the statements, not race. In reviewing the trial transcript, this Court does not find that the prosecution relied on the slurs to incite racial bias, but only to demonstrate the mounting tension leading up to the assault and establish motive.
¶27 The morning after the assault, Hibbard informed Haithcox's brother, Brian, of what took place. At trial, the State admitted text messages that Brian sent to Haithcox in which Brian stated, "Dumb ass nigga," "wish you would have listened," and "nigga plus jail plus Montana plus no money equals not good options." Haithcox's responses to Brian including, "yea[h], I fucked up. [Y]up, I fucking did, B.," were also admitted. Haithcox argues that, in presenting this evidence, the prosecution inappropriately repeated the slurs before the jury, and "dangerously allud[ed] that a black defendant was a 'dumbass nigga.' " We conclude that the proceedings do not support Haithcox's contention. The record demonstrates that the prosecution introduced Brian's statements because Haithcox's response to those statements constituted an admission of guilt. Thus, Brian's initial statements provided important context for Haithcox's incriminating responses. Further, the prosecutor's restatement of the exchange between Brian and Haithcox during closing argument was warranted considering Haithcox's admissions were significant indicators of his guilt.
¶28 Haithcox also takes issue with the prosecution's handling of race during voir dire. Specifically, Haithcox contends: "the prosecutor highlighted that Haithcox was a black man, Hibbard was a Caucasian woman who had a 'little bit of Indian blood in her' and they were shacking up outside of wedlock." We find this characterization of the prosecutor's remarks unsubstantiated and misleading. When questioning potential jurors, the prosecutor explained that Haithcox ***115 was African American and Hibbard was Caucasian and Native American. However, the transcript also reveals that the prosecutor pursued the sensitive topics of race and premarital cohabitation with the goal to remove biased jurors. It is apparent that the prosecution's objective was to eliminate racially prejudiced jurors considering the victim also belonged to a racial minority. After discussing Haithcox and Hibbard's race, the prosecutor asked: "[I]s there anybody that thinks that because somebody may be all or partly a minority, that they're not entitled to a full and fair trial during this week?" After examination of the record, it is evident that the prosecution's discussion of race did not invoke racial prejudice.
¶29 Finally, Haithcox asserts that the prosecution's comparison between the assault and a "slasher movie" in closing argument was improper. We find this contention similarly unpersuasive. In closing, the prosecution analogized Hibbard's behavior after the assault with the behavior of a character in a horror movie-i.e. someone who makes irrational decisions in the face of danger. The analogy in no way commented on Haithcox's race, nor did it infringe upon his right to a fair and impartial trial.
¶30 While this Court takes very seriously Haithcox's allegations that the prosecution invoked racial prejudice in order to inflame the jury and secure a conviction, we conclude that the record does not support Haithcox's claims of prosecutorial misconduct.
¶31 3. Whether the investigators' extraction of the entire contents of Haithcox's cellphone exceeded the scope of the search warrant.
Standard of Review
¶32 This Court reviews a district court's grant or denial of a motion to suppress to determine whether the court's findings are clearly erroneous and whether those findings were applied correctly as a matter of law. State v. Gill , 2012 MT 36, ¶ 10, 364 Mont. 182, 272 P.3d 60.
¶33 After interviewing Hibbard at the hospital, detectives learned she purchased a *462 phone for Haithcox, paid the monthly bill, and had access to the account associated with the phone. At the deputies' request, Hibbard accessed the records, including Haithcox's recent calls and contact information, from the phone. From that information, detectives learned that Hampa had picked Haithcox up in Helena. Detective Dan O'Malley testified that, out of concern for Hampa's safety, he had Hampa's cellphone provider locate her phone to identify her location. On April 14, 2016, AT&T alerted detectives that Hampa's phone was in the Missoula area. Detective O'Malley enlisted the help of Missoula ***116 law enforcement to obtain Hampa's address, where Haithcox was eventually arrested.
¶34 Following Haithcox's arrest, law enforcement obtained a warrant to search his cellphone. The warrant specifically authorized law enforcement to search and seize "text messages, call detail, email, and internet searches" from Haithcox's telephone. Officers downloaded the entire contents of the cellphone. Before trial, Haithcox filed a motion to suppress the evidence seized from his cellphone, arguing that the warrant did not describe the information to be seized with sufficient particularity and the evidence seized exceeded the scope of the warrant. The District Court denied the motion on both grounds.
¶35 The Fourth Amendment to the United States Constitution, and Article II, Section 11, of the Montana Constitution, similarly protect the right of the people to be secure in their persons, papers, homes, and effects from unreasonable searches and seizures. U.S. Const. amend. IV ; Mont. Const. art. II, § 11. The unique language of the Montana Constitution, however, affords Montanans broader protection of their right to privacy than does the Fourth Amendment to the United States Constitution. State v. McLees , 2000 MT 6, ¶ 23, 298 Mont. 15, 994 P.2d 683. Both the United States and Montana Constitutions require that a search warrant particularly describe the items it authorizes to be seized. State v. Chilinski , 2014 MT 206, ¶ 22, 376 Mont. 122, 330 P.3d 1169. A warranted search is unreasonable if it exceeds in scope or intensity the terms of the warrant. Terry v. Ohio , 392 U.S. 1, 18, 88 S. Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). While suppression of evidence is the proper remedy when a seizure exceeds the scope of the warrant, "[t]he exclusionary rule does not require the suppression of otherwise legal seizures merely because they were part of the same search in which an illegal seizure occurred." United States v. Daniels , 549 F.2d 665, 668 (9th Cir. 1977).
¶36 Haithcox reasserts on appeal that some of the evidence seized from his phone exceeded the scope of the warrant, therefore all evidence seized from his phone should have been suppressed. However, at trial, no evidence was admitted or relied upon by law enforcement that fell outside the scope of the items explicitly specified on the search warrant. Considering only information seized beyond the scope of the warrant was subject to suppression, and no such evidence was admitted, the District Court did not err in denying Haithcox's motion to suppress.
¶37 Haithcox further maintains that his constitutional rights were violated when law enforcement received his phone activity from Hibbard without first obtaining a warrant. However, Haithcox did not ***117 raise this issue before the District Court. This Court has long held that "[a]ppellants may not change their theories on appeal from those that they presented in district court." State v. Kuneff , 1998 MT 287, ¶ 26, 291 Mont. 474, 970 P.2d 556. For this reason, we decline to address this argument.
¶38 While Haithcox additionally argues that the cumulative error doctrine necessitates reversal, reversal of a conviction pursuant to that doctrine is proper only if accumulated errors prejudiced the defendant's right to a fair trial. State v. Cunningham , 2018 MT 56, ¶ 32, 390 Mont. 408, 414 P.3d 289. Haithcox failed to identify any errors, therefore application of the doctrine is inappropriate.
CONCLUSION
¶39 For the foregoing reasons, the denial of Haithcox's motion to suppress and his subsequent conviction are affirmed.
We Concur:
DIRK M. SANDEFUR, J.
BETH BAKER, J.
JIM RICE, J.
INGRID GUSTAFSON, J.