FILED

ORIGINAL

09/29/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0500

DA 18-0500

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 246N

STATE OF MONTANA,

        Plaintiff and Appellee,

v.

DAVID DEAN KOMEOTIS,

        Defendant and Appellant.

FILED

SEP 29 2020

Bowen Greenwood
Clerk of Supreme Court
State of Montana

APPEAL FROM:     District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADC-17-055
Honorable Gregory G. Pinski, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Chad Wright, Appellate Defender, Michael Marchesini, Assistant
            Appellate Defender, Helena, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General, Michael P. Dougherty,
            Assistant Attorney General, Helena, Montana

            Joshua A. Racki, Cascade County Attorney, Matthew Robertson, Deputy
            County Attorney, Great Falls, Montana

Submitted on Briefs: July 22, 2020

Decided: September 29, 2020

Filed:

_____
                Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Cascade County charged defendant David Komeotis with seven counts of incest under § 45-5-507, MCA, based on allegations by two of his children, D.K. and M.K. At trial, Komeotis's counsel put on an alibi defense and suggested that his ex-wife, Vanita, had a "vendetta" against him and was responsible for the allegations. Vanita testified that, in December of 2016, she found her nine-year-old son, D.K., looking at pornography on a tablet with a friend. Vanita grounded D.K. and took away his tablet. Vanita testified that she asked him "if anybody had ever touched him because that was my first instinct because I [had] never encountered something like this." D.K. responded that his father, Komeotis, had "touched him." Vanita reported this revelation to D.K.'s counselor, Nikki Lewis-Clark. Lewis-Clark reported it to police, who then interviewed D.K.

¶3 D.K., who was nearly eleven at the time of the trial, testified that his father had "stuck his private part" in his mouth and "would touch [D.K.'s] private part." D.K. testified that the abuse occurred while he was on his knees on the floor of a room in the basement of his grandparent's house, with the door closed. He described the room as messy, with clothes in a closet and on the floor, and with the window covered by a blanket bearing a

2

depiction of a wolf's face. D.K. testified that the abuse had happened more than once, though he could not remember the number of occasions. D.K. testified that his mother routinely called his father a bad guy, a drunk, and a liar.

¶4 M.K., D.K.'s 19-year-old sister, testified that Komeotis had abused her as a child. She testified that between the ages of six and eleven or twelve, Komeotis frequently abused her by showing her pornography and then touching her vagina and breasts and had on one occasion attempted to put his penis in her anus.

¶5 M.K. confirmed that she had visited her father in jail on two occasions—subsequent to D.K.'s allegations of abuse, but prior to making her own—in which she told Komeotis that she did not believe D.K.'s allegations or that Komeotis would abuse his children. M.K. testified that she had said these things to support her father, whom she still loved "[w]ith all [her] heart."

¶6 The State then called Detective Price, the lead investigator on the case, who had observed D.K.'s interview and interviewed M.K. He testified about the investigation, including the interviews of D.K. and M.K. After discussing the interviews, the following exchange occurred:

> State: And you've said you've previously dealt with false reports on sexual assaults—of that sort of nature; is that correct?
>
> Price: Yes.
>
> State: And did you—did either of [D.K.'s] or [M.K.'s] interviews strike you as having been false reports?
>
> Price: No.

¶7 On redirect, the prosecution addressed the issue of M.K.'s inconsistent prior statements to her father, which defense counsel had raised on cross examination. The prosecutor asked "does the fact that [M.K.] told her father when she visited him in jail that he has never done anything like this to us, does that make you think [M.K.] was lying?" Detective Price responded: "No."

¶8 Officer Marshal, another law enforcement officer involved in the investigation, then testified as to his initial interview with D.K. On direct examination, the prosecutor asked, "did [D.K.] provide you any information which made you think he was making up his story?" Officer Marshal responded:

> The way I observed [D.K.], and his statements, his eye contact, his body language, to me he showed genuine signs of telling the truth. Again, not pausing, not having to think, not looking at anybody. TV wasn't on.
> Again, I look at all those signs, obviously being emotional as well, but looking at me and keeping direct eye contact with me.
> When somebody sometimes doesn't tell the truth, they have pauses. It's not as smooth. They lack eye contact. Especially with a child, I found that to be very genuine then and believe them.

¶9 The State also called Nikki Lewis-Clark, the family's counselor and a licensed clinical therapist. She discussed M.K. and D.K.'s mental health issues and PTSD symptoms that she described as stemming from sexual abuse. The prosecution's questioning continued:

> State: Okay. During the course of your work with your clientele in the sex offense realm, have you ever had any of them who have made false allegations?
>
> Lewis-Clark: No, I have not.
>
> State: Okay. And how do you know that? Are there tests that you give them, or examinations you give them, like, a Million Multiaxial, you know, MMPI

4

17—or whatever those acronyms are—do you give them exams to help diagnose whether they have or haven't?

Lewis-Clark: No.

State: Okay. Why not?

Lewis-Clark: There's really no specific test that I know of that—that could determine that. And it would be so rare for false allegations to be presented, so—

State: So it's really hard to tell people you have to disclose everything, and we can then test you, and make sure you have disclosed everything?

Lewis-Clark: Yeah.

State: Basically impossible?

Lewis-Clark: I would say so.

¶10    Lewis-Clark later went on to recount D.K.'s initial allegations to her and testified that he had not displayed signs of coaching or false reporting. The prosecution also asked about M.K.'s earlier communication with Komeotis in jail. Lewis-Clark described M.K. as "not brave enough to tell him, 'Dad, I wish that you would be held accountable for this.' She can't tell him that. She is going to answer to him what he wants to hear because she's fearful of him because he's an authority figure . . . ."

¶11    During closing statements, the prosecution noted that, absent physical evidence, the case was largely a determination of "who do you believe?" The prosecution also recounted Lewis-Clark's description of the children's PTSD symptoms and their potential connection to sexual abuse by Komeotis. The prosecution described the incident where D.K. was caught watching pornography:

5

Let's see—was [D.K.] sexually acting out? If you are looking at porn at age nine, do you think you're sexually acting out? I suspect that's sexually acting out. That's part of his inability to concentrate, his nightmares, his flashbacks, trying to understand why he thinks about those things. Why looking at that might have somehow been helpful to him. I want to see what dad was doing. I want to know why. Why would dad do that to me? Why would dad take me down to his room and put his penis in my mouth? Why?

¶12    The prosecution went on to address M.K.'s inability to recall details of the alleged abuse, and the alibi defense that Komeotis was incarcerated during the time of the alleged abuse:

[M.K.] doesn't recollect those facts because she's been sexually abused. She has trauma. She has reasons not to remember things like this. She's trying not to remember all those details. She doesn't want to. But she has to. She has to everyday walking down the street, sees something, flashback. Go back home. Cower in my bed. Doesn't want to come out. You've heard that testimony as well. They don't want you to believe that [M.K.], with all those problems, with the cutting of her wrists, is believable. They have to make you believe that she isn't telling the truth because if she is telling you the truth, her story makes perfect sense. He wasn't incarcerated. He wasn't in a relationship with [defense witness]. He had access to her. You have to prove she's a liar.

You have to believe that [M.K.] is a liar solely because that's the only way he gets away with raping his daughter for half a decade or more.

He wants you to believe that all this time of incarceration could never have happened. Never had access to [D.K.]. Never had access to him.

¶13    The prosecution described the struggles D.K. and M.K. were experiencing in their lives and attributed them to Komeotis. In closing remarks, the prosecution concluded: "These children have suffered enough, ladies and gentlemen. It's time for them to see the justice they deserve."

¶14    Defense counsel did not object to any of these statements or lines of questioning. Komeotis was found guilty of seven counts of incest. Prior to sentencing, Dr. Robert N. Page conducted a psychosexual evaluation of Komeotis. Dr. Page's report

6

noted that Komeotis was considering appeal and would therefore not discuss particular elements of his involvement. It also stated that Komeotis denied guilt and claimed that his "vindictive" ex-wife was behind the allegations.

¶15 In his report, Dr. Page described Komeotis as someone with a "poor prognosis for staying out of trouble[,]" and as a Tier 2, moderate-risk offender. Dr. Page's report concluded, however, that Komeotis was "compliant throughout the evaluation process, and would be amenable to community based sex offender treatment," with the caveat that Komeotis could have difficulty being accepted by a community treatment provider based on his failure to admit to the crime. The psychosexual evaluation was discussed at length during the June 2018 sentencing hearing, where Komeotis declined to give a statement.

¶16 Komeotis was subject to a mandatory 100-year sentence for each count, under § 45-5-507(5)(a)(i), MCA (2015). However, Komeotis requested that the District Court apply the exception found in § 46-18-222(6), MCA (2015), and impose concurrent sentences of 40 years—with 15 suspended—on all seven counts, allowing for eventual sex offender treatment in the community after incarceration. Komeotis's defense counsel expressed concern that, in relying on Dr. Page's conclusion that Komeotis might not be accepted in community treatment, Komeotis might be punished for exercising his constitutional right to go to trial and maintain his innocence.

¶17 The sentencing court acknowledged: "of course [Komeotis] has the opportunity to exercise his constitutional right to a trial. I mean, that's absolute. And he also has the right to—against self-incrimination at any stage of the proceeding. That right is also absolute." The court went on to conclude, however, that Montana law allowed a court to:

7

sentence a defendant based on his attitudes and character and a lack of remorse, which is very different than sentencing someone based upon the exercise of their constitutional rights.

Regardless, the issue that I interpret Dr. Page's report is saying is that in order to complete or be accepted into Phase 2 of a sex offender treatment program, a defendant has to acknowledge that he is, in fact, a sex offender. And so that's really—that's really the issue. And so I think what Dr. Page is getting across is that it's unlikely that he would be able to complete sex offender treatment as long as he maintains tha[t] denial. And that's his choice. I mean, he's not being punished for it. That's just the—sort of what's required in terms of sex offender treatment.

¶18 In the sentence pronouncement, the District Court considered the need to protect the public and provide justice for the victims who had experienced serious and lifelong damage. The sentencing judge noted how Komeotis had "forced his children to recount horrific acts at the jury trial," and that the imposed sentence would hold Komeotis "accountable, something he has never done himself." The court asserted that, while Komeotis could not be punished for exercising his constitutional right to maintain his innocence, he could be sentenced based on a "lack of remorse." The court looked to Dr. Page's report, which it found to suggest not only that "Komeotis is not likely to admit responsibility[,]" but that he "rationalizes and minimizes his behavior, fails to recognize the harm that he [caused] his victims, and blames his victims and others for his behavior."

¶19 The sentencing court found the community treatment option "inappropriate," after determining that there was "no evidence or indication that Mr. Komeotis is treatable in the community." The court found Dr. Page's report "inconclusive at best," because, though it indicated Komeotis was amenable to community treatment, it also noted he was unlikely to be accepted if he "remains in denial." The sentencing pronouncement underscored Komeotis's "lack of remorse, his minimization and rationalization" and his "moderate risk

8

to reoffend," finding incarceration to be the "only treatment option that's available." The District Court did not apply the statutory exception and instead imposed 100 years for each of seven counts of incest; counts One and Two to run consecutively while the remaining counts ran concurrently.

¶20 On appeal, Komeotis raises two issues. First, he challenges his conviction on the basis of prosecutorial misconduct, arguing that the State improperly vouched for the credibility of its witnesses, attempted to shift the burden of proof to the defense, and urged the jury to convict based upon their sympathy for D.K. and M.K. Second, he maintains that the sentencing court improperly punished him based on his refusal to admit guilt, in violation of his Fifth and Sixth Amendment rights.

¶21 This Court generally does not review unpreserved issues of prosecutorial misconduct based on prosecutorial statements that were not objected to at trial. *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506. The Court will, however, apply plain error review where a violation of fundamental constitutional rights is implicated in a way that raises issues of manifest miscarriage of justice, compromised integrity of the judicial process, or unsettled questions of fundamental fairness. *Aker*, ¶ 21 (citation omitted). The error should "firmly convince" the Court of the existence of a "serious mistake" that demands consideration. *State v. Griffin*, 2016 MT 231, ¶ 6, 385 Mont. 1, 386 P.3d 559 (citation omitted). Furthermore, plain error review is discretionary and exercised "sparingly, on a case-by-case basis, according to narrow circumstances, and by considering the totality of the circumstances." *State v. Haithcox*, 2019 MT 201, ¶ 23, 397 Mont. 103, 447 P.3d 452 (quotation omitted).

9

¶22 Komeotis alleges three ways in which prosecutorial misconduct violated his right to a fair trial. First, he argues that the prosecution improperly elicited testimony from Detective Price, Officer Marshal, and Lewis-Clark vouching for the credibility of D.K. and M.K. In particular, Komeotis points to testimony following the prosecutor's questions to: (1) Detective Price as to whether D.K. and M.K.'s interviews seemed to be "false reports" and whether M.K.'s previous, inconsistent, exonerating statements made him "think [she] was lying" in her subsequent allegations; (2) Officer Marshal, regarding whether D.K. had given "any information which made you think he was making up his story" and whether identifying lies was "part of your law enforcement training"; and (3) Lewis-Clark, asking whether she had ever come across false allegations when working with victims of sexual abuse and to provide insight into M.K.'s previous inconsistent exonerating statements.

¶23 Komeotis maintains that through these lines of questioning, the prosecution improperly impinged upon the exclusive realm of the jury by indirectly vouching for a witness's credibility through testimony by another witness. The State does not dispute Komeotis's claim that the prosecution's questioning of Detective Price and Officer Marshal was improper. Neither does it directly address testimony elicited from Lewis-Clark, explaining M.K.'s previous exonerating statements, though it does defend the questions as to her prior experience with false allegations by abuse victims generally. We need not address whether the prosecution's questioning of Lewis-Clark was improper, however, because we do not find prejudice resulting from the prosecution's inquiries sufficient to warrant plain error reversal.

10

¶24 Komeotis relies on *State v. Hayden*, in which we reversed on plain error review where a prosecutor not only elicited testimony regarding the credibility of another witness, but then went on to offer his own opinion in closing argument that the State's witnesses were "believable." *State v. Hayden*, 2008 MT 274, ¶¶ 31-33, 345 Mont. 252, 190 P.3d 1091. *Hayden* is distinguishable. While the *Hayden* Court made clear that both instances of witness vouching were improper, we find it significant that, here, the prosecutor did not go on to compound the error, as the *Hayden* prosecutor had, by directly vouching for State witnesses—as well as the efficacy of a search of the defendant's residence—in closing.

¶25 Furthermore, the degree of prejudice to Komeotis in this case is less than that present in *Hayden*. No victim or other eyewitness testified against the defendant in *Hayden*. *Hayden*, ¶¶ 9-12. Here, D.K. and M.K. both testified at trial in detail as to their ongoing abuse, creating a much more robust evidentiary basis to support conviction beyond a reasonable doubt. For example, D.K. was able to recall details of the abuse, including that it had occurred while he was on his knees on the floor, in a messy room—with the door closed, clothes in a closet and on the floor, and the window covered by a blanket bearing a wolf's face—in the basement of his grandparent's house. The detailed and compelling nature of the testimony supports the conclusion that any improper questions to the State's other witnesses were harmless.

¶26 While some of the prosecution's questioning of law enforcement was improper, in this case, it does not reach to a level firmly convincing us of a serious mistake evincing manifest miscarriage of justice, unresolved questions of fundamental fairness, or compromised integrity of the judicial process. *See Griffin*, ¶ 6; *Aker*, ¶ 21. On these

11

particular facts, we do not see the prosecutor's questions as rising to the extraordinary level justifying the exercise of discretionary plain error review.

¶27 Komeotis next contends that the prosecution improperly shifted the burden of proof to the defendant during closing argument. In particular, Komeotis points to several statements recounted above in the context of addressing M.K.'s inability to recall some details of her abuse, including: "[t]hey have to make you believe that she isn't telling the truth" and "[y]ou have to prove she's a liar."

¶28 In context, we find that a jury was unlikely to interpret the prosecutor's statements as an appeal to ignore their instructions regarding the State's burden of proof. Instead, a reasonable jury would have interpreted the prosecution's statement as responding to Komeotis's alibi defense and questions regarding M.K.'s credibility. These statements do not rise to the level justifying plain error review.

¶29 Finally, Komeotis argues that the prosecution improperly urged the jury to convict Komeotis based on sympathy for M.K. and D.K. Komeotis points to the prosecution's statements, including those made in closing that "[t]hese children have suffered enough, ladies and gentlemen. It's time for them to see the justice they deserve." In *State v. Ritesman*, a prosecutor told the jury in closing: "My job as the State, and your job as jurors, is to make sure that [the victim] is safe, to make sure that she is heard, and that we give the control back to her. You can do that with the verdict of guilty." *State v. Ritesman*, 2018 MT 55, ¶ 9, 390 Mont. 399, 414 P.3d 261. The *Ritesman* court found that the comments were improper but did not rise to the level of misconduct requiring reversal. *Ritesman*, ¶ 28.

¶30    Komeotis also points to the prosecutor's attempt to speak from D.K.'s perspective in closing: "Why would dad do that to me? Why would dad take me down to his room and put his penis in my mouth? Why?" In context, the prosecutor was clearly attempting to draw an inference between the evidence that young D.K. had been caught watching pornography and his alleged abuse, rather than impermissibly inviting the jury to step into the shoes of a victim. Here, the prosecutor's statements do not reach the level of impropriety in *Ritesman*, and this Court is not inclined to invoke plain error review.

¶31    Komeotis's claims that the prosecution improperly vouched for witnesses, attempted to shift the burden of proof, and encouraged the jury to engage in sympathy-based decision making fall short of the level of prejudicial prosecutorial misconduct needed to justify finding plain error.

¶32    Komeotis's second major claim is that the sentencing court improperly punished him for exercising his Fifth and Sixth Amendment rights to a trial and against self-incrimination. Komeotis argues that the sentencing court declined to apply the statutory exception allowing for eventual community-based sex offender treatment based at least in part on his denial of guilt through trial and sentencing. In particular, Komeotis points to the sentencing court's treatment of Dr. Page's report, which concluded that Komeotis was "amenable" to community based sex offender treatment but might struggle to be accepted into such programs if he continued to deny his guilt.

¶33    This Court has made clear that a greater sentence may not be imposed based on a defendant's exercise of their constitutional right against self-incrimination and that, while "lack of remorse" is generally a legitimate factor to consider, "a sentencing court may not

13

draw a negative inference of lack of remorse from the defendant's silence" or punish defendants for maintaining their innocence. *State v. Shreves*, 2002 MT 333, ¶¶ 20-22, 313 Mont. 252, 60 P.3d 991. The sentencing court's determination that there was no evidence that Komeotis was treatable in the community was erroneous in light of Dr. Page's conclusion that Komeotis was amenable to such treatment. Lack of remorse may, however, be demonstrated by other evidence, such as "the manner of the commission of the offense as demonstrated by the evidence at trial or from other competent evidence properly admitted at the sentencing hearing." *Shreves*, ¶ 21. The compelling evidence regarding the years of abuse that occurred here provides ample evidence of lack of remorse.

¶34 At the time of the alleged offenses, the Montana Legislature had imposed a mandatory 100-year sentence for such crimes and the District Court's discretion was limited. *See* § 45-5-507(5)(a)(i), MCA (2015). The District Court did consider the exception to the mandatory 100-year sentence provided by § 46-18-222(6), MCA (2015). However, the District Court did not find that the alternative would afford "a better opportunity for rehabilitation of the offender and for the ultimate protection of the victim and society . . . ." Section 46-18-222(6), MCA (2015). Allowing for the exception is a discretionary decision for the district court. We cannot say under the facts of this case that the imposition of the mandatory sentence was illegal.

¶35 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no issues of first impression and does not establish new precedent or modify existing precedent.

14

¶36     Affirmed.

_____
                        Chief Justice

We Concur:

_____

_____

_____

_____
                        Justices